IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT (1) 10 HARRIS ROAD, UNIT G, WINDHAM, NH; (2) 19 HAZEL DRIVE, SUITE 1, HAMPSTEAD, NH; and (3) 183 LONDONDERRY TURNPIKE, UNIT 4, HOOKSETT, NH; THE PERSONS OF (4) TOMMY LI (DOB: ████ 1985); (5) CHENGBIN LI (DOB: ████ 1983); and (6) SHANBIN LIN (DOB: ████ 1994); THE VEHICLES (7) A WHITE 2025 PORSCHE WITH TEXAS PLATE VZK3451; (8) A BLACK 2023 CADILLAC ESCALADE WITH NEW YORK PLATE LEE333; (9) A BLACK 2022 BMW X7 WITH NEW HAMPSHIRE PLATE USA8888; and (10) A WHITE 2023 KIA CARNIVAL WITH NEW HAMPSHIRE PLATE 5500533 | Case No. 25-mj-148-01-TSM<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR SEARCH WARRANTS**

I, Special Agent Bradley Nims, being duly sworn, do depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been employed by HSI since April 2018.  I am currently assigned to the HSI Office in Manchester, NH. I have attended 22 weeks of specialized training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia where I graduated from both the Criminal Investigator Training Program (CITP) and the HSI Special Agent Training (HSISAT) program. I was provided formal training in multiple disciplines including money laundering, narcotics trafficking, and fraud investigations. Part of this training included the use of electronic communication devices to facilitate these crimes. I have a bachelor's degree in Criminal Justice and a master's degree in Security and Resilience Studies.

2.      In connection with my official duties, my investigations have involved the use of surveillance techniques and the execution of various search, seizure, and arrest warrants. I have investigated and assisted other agents in numerous cases involving a wide variety of criminal violations including narcotics trafficking, money laundering, illegal importation/exportation of goods, bank fraud, mail fraud, and wire fraud. Based on my training and experience, I am familiar with the methods used by money launderers, including laundering proceeds that are part of large-scale organized schemes. I have received specialized training regarding investigative techniques, evidence collection, and evidence preservation. I communicate constantly with other agents, law enforcement officers, and intelligence analysts in both the private sector and the government to learn new information about current trends and activities associated with money laundering and fraud schemes.

3.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers, non-law enforcement retail investigators, and agents.  In addition, I have reviewed records and reports relating to this investigation.  Other law enforcement agents have similarly reviewed records and reports and relayed their contents to me.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

5.      I make this affidavit in support of an application for search warrants to search the following locations and items:

      a.  The entire premises located at 10 Harris Road, Unit G, Windham, New Hampshire ("SUBJECT PREMISES 1"), as more particularly described in

ATTACHMENT A-1;

b. The entire premises located at 19 Hazel Drive, Suite 1, Hampstead, New Hampshire ("SUBJECT PREMISES 2"), as more particularly described in ATTACHMENT A-2;

c. The entire premises located at 183 Londonderry Turnpike, Unit 4, Hooksett, New Hampshire ("SUBJECT PREMISES 3"), as more particularly described in ATTACHMENT A-3;

d. Tommy LI, an Asian male born ███████ 1985, who is listed as 5'08", weighing approximately 140 pounds, and having black hair and brown eyes, as more particularly described in ATTACHMENT A-4;

e. Chengbin LI, an Asian male born ███████ 1983, who is listed as 5'07", weighing an unknown amount, and having black hair and brown eyes, as more particularly described in ATTACHMENT A-5;

f. Shanbin LIN, an Asian male born ███████ 1994, who is listed as 5'07", weighing approximately 133 pounds, and having black hair and brown eyes, as more particularly described in ATTACHMENT A-6;

g. A white 2025 Porsche Panamera bearing Texas registration number VZK3451 (hereinafter "VEHICLE 1"), registered to Kaiqiang ZHANG and Shanbin LIN, as more particularly described in ATTACHMENT A-7;

h. A black 2023 Cadillac Escalade bearing New York registration number LEE333 (hereinafter "VEHICLE 2"), registered to Chengbin LI, as more particularly described in ATTACHMENT A-8;

i. A black 2022 BMW X7 bearing New Hampshire registration number

3

USA8888 (hereinafter "VEHICLE 3"), registered to Tommy LI, as more

particularly described in ATTACHMENT A-9; and

j.  A white 2023 Kia Carnival bearing New Hampshire registration number

5500533 (hereinafter "VEHICLE 4"), registered to Tommy LI, as more

particularly described in ATTACHMENT A-10.

6.    Based on my training and experience, and the facts set forth below, there is probable cause to believe that SUBJECT PREMISES 1, 2, and 3, VEHICLES 1, 2, 3, and 4, and the persons of Tommy LI, Chengbin LI, and Shanbin LIN contain evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 1341, 1343, 1349, 1956, and 1957 (mail fraud, wire fraud, money laundering, and related conspiracies) (the "TARGET OFFENSES").

## PROBABLE CAUSE

### Background – Chinese Gift Card Fraud

7.    Based upon my training and experience, conversations with other law enforcement, and knowledge of other investigations, I am aware that a common tactic within Organized Retail Crime (ORC) includes the exploitation of stolen and/or fraudulently-obtained gift cards to make purchases of high-valued merchandise, such as Apple brand electronics and cell phones.  This merchandise is then in turn sold to others in the United States and abroad. The end-purchaser(s) of these devices typically have no knowledge of the original fraud.

8.    While there are varying levels of sophistication and methods of conducting these gift card scams, one such method involves the coordinated efforts of entering a retail establishment and stealing hundreds, if not thousands, of inactive gift cards from their display racks. The gift card number, PIN number, and other pertinent information are recorded into a

4

computer program that repeatedly checks the retailer's website to determine when a customer makes a legitimate purchase of the compromised card by adding money to it. The card is then subsequently either repackaged or restored to its original condition and brought back to a retail establishment and placed back on the shelves for sale.

9.      At this point, an unsuspecting customer will select a gift card off the shelf, add funds to it at checkout, and leave the store. Once the program tips off the fraudster that the gift card has been loaded with money, the card details are either used in an online purchase or electronically disseminated to co-conspirators who are sent to make in-person purchases at retail locations. The original physical gift card is not necessary for use by co-conspirators as the pertinent information has been obtained and can be transmitted to other co-conspirators' electronic devices, such as cell phones. High value electronic items such as Apple iPads, iPhones, and computers are often purchased and shipped or brought back to a central location for distribution and resale.

10.      Other methods utilized in these schemes involve the utilization of stolen funds or proceeds of illicit activity (such as hacking, romance or elder fraud, and sextortion) to purchase physical or electronic gift cards. These gift cards are then used online or disseminated to individuals who are sent to make purchases online or at physical retail locations.  This is a form of money laundering, as the gift cards conceal the source of the illicitly obtained funds.  Using gift cards raises less suspicion than using bulk currency to make large volume purchases of high-value electronic items. Similarly, by using gift cards, fraudsters can avoid using credit cards which are linked to an actual identity. The inherent anonymity of gift cards makes tracing of the stolen funds extremely difficult and thus, attractive tools for money laundering. The individuals who make the retail purchases using the gift cards are paid a small sum of money, often for each

device that they turn over to the organizer(s) of the scheme.

11.     Throughout the duration of my investigation, which began on December 28, 2023, law enforcement executed searches of multiple New Hampshire warehouses that were routinely receiving high volumes of fraudulently obtained Apple electronics.  These Apple electronics were all purchased using gift cards that are all suspected to be stolen or fraudulently obtained.

12.     Through interviews of several subjects, including individuals who have pleaded guilty, and witnesses, my investigation has shown that fraudsters are directing electronics to be shipped to New Hampshire warehouses due to the state's lack of sales tax.

13.     My investigation has further shown that there appears to be multiple groups of Chinese nationals or persons of Chinese descent operating these warehouses.  I will refer to these individual groups as "cells."

14.     To date, law enforcement has seized well over 10,000 brand-new Apple electronics from various New Hampshire warehouses. Law enforcement sent many of the seized electronics' serial numbers to Apple.  Apple confirmed that over 120,000 gift cards were used to purchase these devices, totaling over $13,000,000.00 in gift card funds. These were devices seized from six warehouses between two cells. Data is still pending for the order details from additional search warrant locations in this investigation. There are believed to be numerous other warehouses and cells currently operating in New Hampshire based on conversations with FedEx, UPS, and Apple, as well as records obtained from those entities.

15.     The cards used to purchase the seized devices were originally purchased or acquired from across the United States, and usually shortly before the Apple devices themselves were purchased.  However, the vast majority of these cards were redeemed in China following their activation in the U.S. Some of the gift cards used to acquire Apple electronics for shipment

to New Hampshire were used in as little as 24 hours after acquisition, despite being purchased in regions far away from New Hampshire.

16.     Although tracing of the Apple devices back to the original gift card owners has proven to be challenging, law enforcement has spoken with several victims whose gift cards were used to purchase electronics that were confirmed to have gone to these New Hampshire warehouses.

17.     As part of this investigation, law enforcement executed search warrants on personal phones seized from New Hampshire warehouse workers.  Searches of the phones have revealed commonalities among each cell involved in the gift card fraud scheme.

18.     The cells of Chinese nationals operating New Hampshire warehouses all use WeChat, a Chinese-based messaging platform that does not comply with U.S. legal process. Those communications include photographs, texts, and emails.  In some instances, the WeChat messages contain strings involving various groups that both purchased and exchanged fraudulently-obtained gift card numbers and PINs.  WeChat participants have cautioned others about using the cards, cautioning that the cards may be confiscated or deemed invalid.   For example, one cell shared a link to Homeland Security Investigations' Project Red Hook website, which is HSI's broader initiative to combat Chinese organized crime groups who are exploiting gift cards to launder money.

19.     This investigation is a part of Project Red Hook.

20.     The cells' WeChats also discussed the sale and purchase of electronic devices, primarily Apple products.  Other conversations included messages about New Hampshire-based warehouses and where to ship and/or bring devices to.  There are also numerous discussions mentioning FedEx shipments.  Photographs of pricing charts for electronics were also found

7

within these WeChat conversations.

21.     Additionally, the nominal recipients listed on the shipping labels at the warehouse locations were largely all different persons, with some clearly being fictitious persons, such as "Chicken" and "Tree" listed as the first names.  Other names have been a jumbled array of random letters that do not resemble any sort of name.

22.     According to Apple, none of the New Hampshire warehouses identified to date as part of this investigation, including SUBJECT PREMISES 1, 2, and 3, are authorized wholesalers, retailers, or resellers of Apple.

23.     Law enforcement has also interviewed workers at several of the New Hampshire warehouses (not including SUBJECT PREMISES 1, 2, and 3) receiving large quantities of Apple products.  Most claimed to simply be "re-shippers" who get paid a commission per device, anywhere from $5 to $10.  According to the workers, their bosses are typically in China.  The workers primarily communicate with their purported bosses through WeChat and usually do not know the bosses' real names.  Several individuals have advised law enforcement they are aware the devices are likely stolen or illegally obtained.  Interviews also revealed that this type of scheme relies heavily on the use of electronic devices, such as cell phones, to facilitate purchasing and exchanging fraudulent gift card data and the subsequent purchase and shipment of electronics purchased with the fraudulent gift cards.

24.     Additionally, searches of personal phones seized from the broader investigation showed the cells operating in New Hampshire frequently purchased gift card data with cryptocurrency.  Cryptocurrency can only be accessed through electronic devices.

25.     Despite claims from several of warehouse workers and operators about being mere "re-shippers" that do not own the Apple electronics flowing through the warehouses,

8

evidence from their seized personal devices indicate at least some of them are purchasing Apple devices using gift cards and reselling them as the beneficial owner. This discovery was based on invoices located within their devices and traditional financial analysis obtained from bank records.

26.    Other common evidence found throughout other warehouses include informal, handwritten ledgers with pages of gift card information and transactions from major retailers such as Walmart, Target, and Best Buy. These warehouses also track shipment quantities and device descriptions. Due to the voluminous amounts of incoming shipments, most warehouses used dumpsters on the premises to dispose of the carboard shipping boxes. During interviews, many neighbors of these warehouses voiced their frustrations about these workers routinely filling up the dumpsters.

27.    Finally, each warehouse involved in this investigation to date has been found to either export the devices overseas directly, primarily to China or Dubai, or ship the devices to Miami, FL, where they are then later exported overseas, primarily to South America.

28.    The proceeds generated from the final sale of the electronics to the consumer obfuscates the origin of the illegally obtained funds used to purchase the merchandise. All parties involved throughout this cycle, including the initial fraudsters, the gift card dealers, the merchandise re-shippers, and the gray-market importers, profit along the way. A gray market involves selling genuine products through channels not authorized by the manufacturer, and usually at a discount. Unlike the black market, which deals with illegal items, gray market goods are legitimate but are distributed outside approved networks.

**Attempted Robberies & Thefts Involving Illicit Apple "Re-Shippers"**

29.    Since beginning this investigation, I am aware of several robberies or attempted

9

robberies in New Hampshire and elsewhere targeting these Apple "re-shippers."  One such

incident occurred on April 7, 2025, at 51 Harvey Road, Unit F, Londonderry, NH.  During this

robbery, the robbers can be heard from the unit's video surveillance system asking where the

phones are and telling an accomplice over the phone that there were no phones there.  At least

one suspect can be seen holding a gun, and an Asian female warehouse worker was zip-tied

during the robbery.  It is believed that this robbery was an attempt to hit Unit D at that same

address.  Unit D is a known warehouse used to receive and ship large amounts of Apple

products.

30.    On May 19, 2025, another robbery attempt occurred at 4 Peabody Road, Unit 2, in

Derry, NH. That morning, FedEx and UPS delivered approximately 672 iPhones. Shortly after

the final delivery, a U-Haul van pulled up and three subjects exited and approached one of the

warehouse workers near his car. After a short altercation, the Asian warehouse worker was

stabbed multiple times and was later pronounced deceased at Elliot Hospital in Manchester. The

subject who stabbed him was later identified as involved in the aforementioned Londonderry

robbery attempt.

31.    On June 27, 2025, a robbery attempt was made in Sweetwater, FL, at a location

that had just received hundreds of Apple electronics from a New Hampshire based "re-shipper"

that law enforcement has been tracking. The FBI in Miami confirmed that the phones that were

being pursued had shipping labels from an address in Salem, NH, as well as an address in

Oregon.  The robbers wore Michael Myers masks and zip tied the Asian workers.  Police arrived

during the robbery and shots were fired by the police. The suspects carjacked a vehicle and were

later captured following a police pursuit. One of the suspects was shot by the police.

32.    Other robberies over the past year have been successful in stealing Apple products

in New Hampshire.  One such robbery occurred in early 2025 in Manchester where the robbers pushed a FedEx delivery driver to the ground while she was delivering Apple phones to a purported Asian re-shipper.

33.    Another robbery occurred in Londonderry in 2024 where a purported Asian re-shipper was robbed bringing boxes of iPhones into the Londonderry FedEx.  The robber stole the phones as the re-shipper was attempting to drop them off.

34.    On July 6, 2025, the UPS facility located at 3 Whipple Street in Nashua, NH was broken into at just prior to midnight and several subjects wearing masks are observed running through the UPS facility.  It was later discovered that they stole over 600 iPhones that were slated for delivery to several purported "re-shippers" that law enforcement has been tracking.

35.    Oregon is another state with no sales tax.  I have spoken with law enforcement in Oregon and learned that there are other similar purported re-shippers operated by persons of Chinese descent there.  Robbers targeting the Apple devices are also stealing from warehouses/re-shippers in Oregon.

**Apple Products Sent to SUBJECT PREMISES 1**

36.    In July 2025, information was obtained from Apple, FedEx, and UPS regarding daily bulk Apple shipments to 10 Harris Road, Unit G, Windham, NH ("SUBJECT PREMISES 1"). Records obtained from Apple indicate that SUBJECT PREMISES 1 has received 46,364 Apple devices from May 1, 2025 to July 17, 2025, totaling $47,242,720.10.  That is an average of over $600,000 worth of Apple products per day, including weekends and holidays, which are typically days that SUBJECT PREMISES 1 is inactive.

37.    For example, based on records provided by Apple, consider the following 20 shipments of Apple devices that were ordered on June 13, 2025 and delivered to SUBJECT

PREMISES 1:

    a.  All orders were funded entirely with gift cards. Each order was linked to a separate Apple ID account. However, the devices were purchased either by uploading the gift cards to an Apple ID wallet or by using gift cards directly without pre-uploading them to the account wallet.

    b.  14 of the 20 orders involved uploading gift cards to Apple ID wallets first and then making the purchase using the wallet account balance. These 14 Apple ID accounts utilized 117 gift cards total. The denominations of these gift cards ranged from $2 to $500. All gift cards were originally purchased from various merchants in the U.S., such as Walmart, CVS, and Dollar General, and were activated in the U.S. However, all were redeemed in China.

    c.  The oldest gift card used in these orders was from June 3, 2025.

    d.  10 of the 117 cards were activated on June 13, 2025 (the day of the orders) and one card was activated on June 14, 2025. Again, all cards were activated in the U.S. but redeemed in China.  I believe the apparent discrepancy arising from the gift card that was activated on June 14 but used on June 13 is attributable to the 12-hour time difference between China and U.S. Eastern Daylight Time.  It is believed that actors involved in this fraud scheme use gift cards quickly before they are frozen by the card vendor or merchant.

    e.  The remaining six orders were funded directly with gift cards without first uploading them to an Apple ID wallet. These six orders utilized 80 gift cards total. The denominations of these gift cards ranged from $0 to $500. Numerous gift cards in these transactions showed a gift card balance of $0.

According to Apple, it is believed these $0 gift cards were an attempted use of that card despite the cards not having any funds on them. Apple did not provide activation and redemption data for these direct gift card purchases.

f.  One shipment was for an Apple Watch Ultra at a cost of $799. The remaining 19 orders were all for iPhone 16 Pros and Pro Maxs, ranging in price from $999 to $1,199, depending on model and data storage size.

g.  In the "Bill To" customer information for these 20 orders, every order included a different name, email, address, and phone number. The physical addresses were from different areas and states across the U.S., despite them all being shipped to SUBJECT PREMISES 1. A review of these addresses identified a number of invalid zip codes. For instance, one order shows a "Bill To" address of 711 Pamela Dr, Punta Gorda, FL 33900. According to the U.S. Postal Service (USPS) website, 33900 is not a valid U.S. zip code. Another "Bill To" address was 4878 Deer Ridge Drive, Red Bank, NJ 36494.  The number 36494 is also not a valid U.S. zip code.

h.  The "Bill To" phone numbers listed for each order further indicate fraud. According to multiple online sources, including the North American Numbering Plan Administration (NANPA), three of the 20 phone numbers listed in these orders do not have U.S.-assigned area codes: ((568) 912-3121; (156) 516-1658; and (879) 587-0000). This is odd as the associated "Bill To" addresses are all in the U.S. Further, none of the remaining 17 U.S.-assigned area codes align with the geographical area of the listed "Bill To" address associated with the corresponding order.

13

i.   Most of the listed addresses and corresponding area codes used are in different states. Only one address matched an in-state area code; however, that area code was still not assigned to that address's region (703 Spaulding St, San Angelo, TX 76900; phone number (903) 523-0595). Area code 903 is assigned to northeastern Texas. San Angelo, TX is in central Texas and has area code 325. These "Bill To" phone numbers are also all the same as the "Ship To" phone numbers.

j.   In the "Ship To" section, all 20 orders were shipped to SUBJECT PREMISES 1. Despite 20 different "Bill To" names, addresses, emails, and phone numbers, 11 of the 20 orders were sent to one person: "jiujiu wu." Other names included JinLi Opal, Rainbow Hua Michael, SEN YA, Juan Chen, Nell Fleur, and XU ZAO. Some of these names were used twice. Further, only one "Bill To" customer had an address that was actually in New Hampshire. The "Bill To" street address on this order was "Zms, Windham, NH" and showed a "Bill To" name of "10 Harris Road Unit G" (SUBJECT PREMISES 1).

38.   Based on the foregoing, I believe all 20 of these orders were made using fraudulently-obtained gift cards. I further believe, based on the entirety of this investigation, that these 20 orders are representative of all the orders shipped to SUBJECT PREMISES 1. According to Apple, it appears that most, if not all, of the 46,364 orders sent to SUBJECT PREMISES 1 over the last two-and-a-half-months were placed with gift cards that were activated in the U.S. and redeemed primarily in China and Hong Kong.

39.   Again, this pattern is similar to the information received from Apple based on the previous search warrants executed in this investigation.

14

40. In addition, on July 8, 2025, a male victim in Pennsylvania reported to local police that he was being blackmailed. The male victim sent sexually explicit photographs of himself over the social media platform Kik to someone he thought was a woman named "Amelia" using the username "luvaerbey." The person who received the photographs demanded the victim pay $500 or else he would release the victim's photographs. The victim first tried sending $500 through Venmo and PayPal but was unsuccessful. Eventually the victim purchased a $500 Apple gift card and sent pictures of the card through Kik.

41. Law enforcement traced the $500 gift card and confirmed it was used on July 8, 2025, shortly after the extortion occurred. The gift card was used to help purchase an iPhone 16 Pro Max, 256 GB. That iPhone 16 was shipped to SUBJECT PREMISES 1.

**Surveillance of SUBJECT PREMISES 1**

42. Surveillance of SUBJECT PREMISES 1 has confirmed the daily heavy shipping volume of incoming packages from Apple. Surveillance was conducted both in-person and through pole cameras. Activity is constant and routine at SUBJECT PREMISES 1. Warehouse workers arrive in the morning, anywhere from approximately 8:30 am to 11:30 am. They wait for UPS and FedEx to deliver the packages, which normally occurs between 9:30 am and 12:00 pm. Since the large bay door of SUBJECT PREMISES 1 is immediately closed following deliveries, I believe the workers spend their time inside opening the Apple devices from the outer cardboard shipping boxes. These small cardboard shipping boxes are routinely observed being thrown away in the large dumpster located on the north side of SUBJECT PREMISES 1. On several occasions, the workers have been observed inside of the dumpster trying to flatten the boxes to make more room for additional boxes given the sheer quantity of packages.

43. The workers then consolidate and re-package those devices into larger boxes, which have been observed to be heavily wrapped in brown shipping tape. They will then load these boxes into one or more of their vehicles, depending on how many they have. The boxes are then driven to FedEx located at 10 Industrial Drive in Londonderry, NH to be shipped out.

44. For instance, surveillance conducted on June 18, 2025 reflects a typical day at SUBJECT PREMISES 1:

    a. At 11:33 am, a white Kia Carnival minivan (VEHICLE 4) and black BMW SUV (VEHICLE 3) arrived at SUBJECT PREMISES 1. VEHICLE 3 backed into the garage. VEHICLE 4 blocked the garage after closing. VEHICLE 3 then exited the garage after two minutes, and VEHICLE 4 backed into the garage. An Asian female in a light pink sweater and pink pants exited VEHICLE 3 and walked into SUBJECT PREMISES 1.

    b. At 12:32 pm, a UPS truck pulled in front of SUBJECT PREMISES 1, and the UPS driver began to unload boxes. Minutes later, an Asian male in a white shirt and black pants came to assist, and an Asian female in a blue shirt and pants brought over mail bins. The female in the blue shirt brought boxes inside from UPS while the male in the white shirt appeared to talk on the phone. The male in the white shirt then walked back inside, being let in by someone wearing a black shirt. The UPS truck later departed.

    c. At 2:50 pm, the female in the blue shirt and pants opened the SUBJECT PREMISES 1 door to let an Asian male wearing a white shirt and black pants inside and an Asian male in a blue shirt and jeans out. The two men were carrying away a blue mail bin filled with cardboard boxes. They loaded the

mail bin into the back of a black Cadillac Escalade (VEHICLE 2). The man in the white shirt and black pants got into VEHICLE 2 while the man in the blue shirt and jeans ran back inside SUBJECT PREMISES 1. VEHICLE 2 then drove away.

d.  At 4:30 pm, the SUBJECT PREMISES 1 garage door opened, and an Asian female wearing a light pink shirt and pink pants stepped out and got into VEHICLE 3. VEHICLE 4 pulled out of the garage and parked next to VEHICLE 3. VEHICLE 3 then backed into the garage, and the garage door closed. Minutes later, VEHICLE 3 exited the garage, and both VEHICLES 3 and 4 drove away.

e.  At 5:08 pm, an Asian male in a white shirt and black pants and an Asian female in a white shirt and white pants exited from the warehouse side door. They both got into a white Porsche (VEHICLE 1) and drove away.

f.  At 5:43 pm, VEHICLE 2 returned and parked outside. Minutes later, VEHICLE 1 returned, and the garage door opened. VEHICLE 2 then backed into the garage. The Asian man in a white shirt and black pants and the Asian woman in a white shirt and white pants stepped out of VEHICLE 1 and walked into the garage. The garage door closed behind them.

g.  At 6:09 pm, the garage door opened, and the Asian man in a white shirt and black pants and the Asian woman in a white shirt and white pants exited and got into VEHICLE 1. A different Asian man in a white shirt and black pants stepped out of VEHICLE 2 to talk to the woman before returning to VEHICLE 2. Both cars then left the scene.

17

45.     On June 25, 2025, investigators conducted physical surveillance of SUBJECT PREMISES 1 and were able to identify some of the workers that were observed during the June 18 surveillance described above. At approximately 3:30 pm, VEHICLE 3 and VEHICLE 4 were observed leaving SUBJECT PREMISES 1. Minutes later, VEHICLE 4 was pulled over by the Windham Police Department (WPD) for a traffic violation on Route 111. According to the WPD, the driver was identified by her New York driver's license as Yong Zhen LI (DOB: ███ 1987). The three other passengers provided identification after being asked. Fengpeng WENG (DOB: ███ 1985) was identified by his U.S. Employment Authorization card. Shanbin LIN (DOB: ███ 1994) was identified by his New Hampshire driver's license. Chen Mu YING (DOB: ███ 1960) provided her name and birthdate verbally to the officer.

46.     Following the traffic stop, investigators continued to follow VEHICLE 4 to FedEx located at 10 Industrial Drive in Londonderry where the car passengers dropped off a quantity of packages. The two male occupants (WENG and LIN) unloaded multiple boxes that were heavily wrapped in shipping tape. The subjects used two carts to wheel them into FedEx. VEHICLE 4 was then followed to 79 Caldwell Road in Nashua, NH. This is the residence of Tommy LI, the registered owner of VEHICLE 3 and VEHICLE 4. VEHICLE 3 was observed parked in the garage of the residence.

47.     On this same day, investigators later followed up with FedEx located at 10 Industrial Drive and were provided access by FedEx management to the packages that were dropped off.  There were only five different shipping labels amongst the numerous packages. Details of the labels are as follows:

      a.  Label 1:
            1.  Origin: Wendy Wu, New Matrix, 13 Garabedian Dr Ste B, Salem, NH 03079

    2. Destination: Ruifeng Yan, FedEx Ship Center, 10000 NW 21st St, Miami, FL 33172
    3. Contact Number: (929) 204-3323
    4. Shipping Date: June 25, 2025
    5. Weight: 30.00 lbs
    6. Reference: QTY 30
    7. Service: Standard Overnight

b. Label 2:

    1. Origin: Juan Chen, Meiya JCL, 13 Garabedian Dr Ste B, Salem, NH 03079
    2. Destination: Jianfeng Wu, FedEx Ship Center, 10000 NW 21st St, Miami, FL 33172
    3. Contact Number: (929) 884-9011
    4. Shipping Date: June 25, 2025
    5. Weight: 15.00 lbs
    6. Reference: QTY 40
    7. Service: Priority Overnight

c. Label 3:

    1. Origin: Ling Dong, New Matrix, 13 Garabedian Dr Ste B, Salem, NH 03079
    2. Destination: Ling Dong, Hold for Pickup, FedEx Ship Center, 10000 NW 21st St, Miami, FL 33172
    3. Contact Number: (971) 345-6627
    4. Shipping Date: June 25, 2025
    5. Weight: 20.00 lbs
    6. Reference: QTY 45
    7. Service: Standard Overnight

d. Label 4:

    1. Origin: Juan Chen, Meiya JCL, 13 Garabedian Dr Ste B, Salem, NH 03079
    2. Destination: Fahad Saked, FedEx Ship Center, 1200 Capital Ave, Plano, TX 75074
    3. Contact Number: (347) 362-2549
    4. Shipping Date: June 25, 2025
    5. Weight: 15.00 lbs
    6. Reference: QTY 40
    7. Service: Priority Overnight

e. Label 5:

1. Origin: Ling Dong, New Matrix, 13 Garabedian Dr Ste B, Salem, NH 03079
2. Destination: Ling Dong, Hold for Pickup, FedEx Ship Center, 10000 NW 21st St, Miami, FL 33172
3. Contact Number: (971) 345-6627
4. Shipping Date: June 25, 2025
5. Weight: 35.00 lbs
6. Reference: QTY 40
7. Service: Standard Overnight

48.    Not one label listed SUBJECT PREMISES 1 as the return address.  This is believed to be a deliberate tactic to conceal and layer the shipping source of the Apple devices. This tactic has also been observed in other warehouses investigated to date for similar gift card/Apple device schemes in New Hampshire and other states.

49.    In mid-July 2025, the FedEx located at 10 Industrial Drive in Londonderry, NH, advised me that a new warehouse located at 19 Hazel Drive, Suite 1, in Hampstead, NH (SUBJECT PREMISES 2) had just started receiving bulk Apple shipments. FedEx further advised that the driver delivering those packages recognized the recipients as the same subjects operating a prior warehouse located at 3 Owens Court in Hampstead, NH, which was previously receiving daily bulk Apple electronics prior to shutting down.

50.    Investigators in this case had previously spent considerable time surveilling the 3 Owens Court address and, prior to it shutting down, observed many of the same subjects and vehicles operating that warehouse that are now operating SUBJECT PREMISES 1. As described below, surveillance conducted by investigators of both SUBJECT PREMISES 1 and 2 has confirmed that both locations are being operated by the same cell of Asian persons.

**Apple Products Sent to SUBJECT PREMISES 2**

51.    As with SUBJECT PREMISES 1, records were obtained from Apple for order information on the Apple shipments to 19 Hazel Drive, Suite 1, Hampstead, NH (SUBJECT

20

PREMISES 2). Records indicate that SUBJECT PREMISES 2 has received 2,232 Apple devices from June 22, 2025 to July 20, 2025, totaling $1,794.967.52.

52.    Since SUBJECT PREMISES 2 only recently began receiving Apple shipments, Apple provided the entire order history associated with SUBJECT PREMISES 2 to date.  A review of these orders indicates fraud within each purchase:

    a.  All 2,232 orders were funded entirely with gift cards.  It appears each order was linked to a separate unique Apple ID account. However, the devices were purchased either by first uploading gift cards to an Apple ID wallet or by using the gift cards directly without pre-uploading them to the account wallet.

    b.  Out of the 2,232 orders, 364 orders involved uploading the gift cards to the Apple ID wallets first and then making the purchase using the Apple ID wallet balance. These 364 Apple ID accounts utilized 6,008 gift cards total. Denominations of these gift cards ranged from $2 to $500. All gift cards were purchased from various merchants, such as Walmart, CVS, and Dollar General. All the gift cards were also activated in the United States. However, 5,949 were redeemed in either China or Hong Kong. The remaining 59 cards were redeemed from either the U.S, Japan, or Sweden. The oldest card used was from June 22, 2025, and the most recent one was from July 18, 2025. Again, it is believed that the actors involved in this scheme use the cards quickly before they are flagged or frozen by the vendor or merchant.

    c.  The remaining 1,868 orders were funded directly with gift cards without first uploading them to an Apple ID account wallet. These orders utilized 17,704 gift cards in total. Most of these orders used multiple gift cards.

Denominations ranged from $0 to $500. Numerous gift cards in these transactions showed a gift card balance of $0 that were used. Some cards were also in amounts less than $1, such as $0.05. According to Apple, it is believed these $0 gift cards were an attempted use of that card despite the cards not having any funds on them.  I believe that the fraudsters in this scheme may acquire the $0 cards without knowing they had no money on them or lose track of which ones have already been used, based on the sheer volume of cards being transacted. Apple did not provide activation and redemption data for these direct gift card purchases.

d.  Purchases included Apple TV 4Ks, iPads, and iPhones. All orders were Apple electronics, ranging in price from $99 for an Apple Pencil 1st-GEN-AME to $1,399 for an iPhone 16 Pro Max (512 GB).

e.  Law enforcement reviewed the "Bill To" customer information.  Just looking at the first 20 orders, the majority of them included a different name, email, and phone number. Some of the names appear valid, such as "Corey Reynolds," while others appear fake, such as "eohfdjfh noe." The "Bill To" addresses were from the following states: NH, NV, PA, CO, AL, MO, AZ, and OR.  Several of these zip codes appear invalid. For instance, three of these first 20 orders were for an address located on E. Locust Street in Centre Hall, PA with zip code "16800." According to the U.S. Postal Service (USPS) website, this is an invalid zip code. USPS lists the zip code "16828" as the only zip code for Centre Hall, PA.

f.  Additionally, the "Bill To" street address for this E. Locust Street is listed on

22

two of the three orders as house number 10151516 and the third order as 1551876. Both are extremely large digits for an address, with one of those not matching the other two numbers. This is despite all three being the same "Bill To" name of Colin Ramos.

g. Another batch of names in these first 20 orders include four English names followed by the same last name of "Gao." All four "Bill To" cities were in Lebanon, MO. However, three of the four list the same street name of "Glenridge St" but with the street numbers as 20, 19, and 24.

h. A review of the "Bill To" phone numbers listed for the first 20 orders further indicates fraud. Many of the area codes do not match the geographical locations of the associated addresses. Using multiple online sources, including the NANPA website, most of these first 20 orders listed addresses and area codes that do not correspond to each other. In the three aforementioned "Colin Ramos" orders with "Bill To" addresses in Centre Hall, PA, the phone numbers listed are different, including the area codes. The area codes listed are 230, 471, and 334. Area code 230 is not a U.S assigned area code, while 471 is Mississippi and 334 is Alabama, not Centre Hall, PA. Similarly, the four Lebanon, MO orders all show different phone numbers, but all use a 615 area code. However, the 615 area code is assigned to Tennessee, not Missouri. These "Bill To" phone numbers are also all the same as the "Ship To" phone numbers.

i. In the "Ship To" section, all 2,232 orders were shipped to SUBJECT PREMISES 2. In reviewing the same first 20 orders, many of these orders

23

have a different "Ship To" name from the "Bill To" name. For instance, many

of these 20 "Ship To" names are "Annie li134." Others are different variations

of the same "Annie li" name, such as "Annie li60" or "li12 Annie." These

"Annie" "Ship To" names are all different compared to the "Bill To" names.

j.  The email addresses listed in the "Bill To" and "Ship To" emails appear to

match on all 2,232 orders. However, despite multiple orders in the same "Bill

To" name, such as "Colin Ramos," or the same "Ship To" name, such as

"Annie li134," the emails are all different on each order. Most also appear to

be unusual and/or potentially foreign domains, such as vowionif@addin.uk or

gcfrz9uq@htiwe9.com.  The use of unusual and/or foreign domains is another

hallmark of fraud given the difficulty in serving U.S. legal process on them.

53.    Based on the foregoing, I believe all 2,232 orders were made using fraudulently-obtained gift cards. The order details of the first 20 orders analyzed appear to be representative of all orders sent to SUBJECT PREMISES 2.  Therefore, I believe all the SUBJECT PREMISES 2 orders are permeated with fraud.

54.    Again, this pattern is similar to that of other Asian warehouses receiving bulk shipments of Apple products encountered in this investigation.

**Surveillance of SUBJECT PREMISES 2**

55.    Surveillance of SUBJECT PREMISES 2 has also confirmed a daily heavy shipping volume of incoming packages from Apple.  Like SUBJECT PREMISES 1, the activity for SUBJECT PREMISES 2 is constant and routine. This activity is identical to SUBJECT PREMISES 1 in that warehouse workers arrive in the morning in a mixture of the same cars (VEHICLES 1, 2, 3, and 4) previously identified from the SUBJECT PREMISES 1 surveillance.

24

They then wait for deliveries to be made, spend time inside SUBJECT PREMISES 2

consolidating and repacking the devices, and then drive them to FedEx later in the day to ship the

packages out. Since SUBJECT PREMISES 2 has only been operational since July 2025,

surveillance by investigators has been limited compared to surveillance conducted at SUBJECT

PREMISES 1.

56.     Surveillance of SUBJECT PREMISES 2 has revealed the following:

a.  On July 18, 2025, an investigator observed that there were no vehicles parked

near the garage bay closest to the wood line, which was identified as

belonging to Unit 1. The bay door was open, and no one was seen inside. This

unit was separated from the other bays, accessible only through its own entry

door and the bay door. Inside, the unit appeared mostly empty aside from

numerous cardboard boxes.

b.  At approximately 10:40 am, a UPS truck backed up to SUBJECT PREMISES

2, and an Asian male began collecting packages from the driver. The male

appeared to have an earbud in his left ear, possibly communicating with

someone. After the delivery, the investigator made contact with the UPS

driver away from SUBJECT PREMISES 2. The driver confirmed that he had

just delivered 119 Apple products, stating this was the largest shipment so far

since SUBJECT PREMISES 2 was relatively new to his route. Initial

deliveries consisted of smaller quantities, typically between 20 and 50

packages. The driver stated that during those first deliveries, the bay door

remained closed, and a black Cadillac Escalade with New York plates

(VEHICLE 2) would meet him. The person signing at that time was an Asian

male identifying himself as "Li." Again, Chengbin LI is the registered owner of VEHICLE 2, bearing New York registration number LEE333, that was regularly seen at SUBJECT PREMISES 1.

c.  More recently, a different Asian male has been signing for the packages as "Wei." There was no business name on the packages, and the packages were addressed to "Jo Jo." The driver mentioned that during his delivery the day prior, a black BMW X7 with New Hampshire plate that the driver recalled as "USA8888," (VEHICLE 3) was present.  Again, Tommy LI is the registered owner of VEHICLE 3, bearing New Hampshire registration number USA8888.

d.  The UPS driver noted he frequently sees VEHICLE 3 and VEHICLE 2, which he believes are associated with another unit he delivers to in Windham, NH (specifically, SUBJECT PREMISES 1). The driver also advised that there are cameras inside the UPS truck that record during deliveries, and he has been backing up to the bay door intentionally to capture vehicles and individuals receiving the packages based upon his suspicion of nefarious activity at this location.

e.  The UPS driver usually delivers to SUBJECT PREMISES 2 between 10:30 am and 10:40 am. However, due to the increasing volume of Apple products, he plans to make this his first stop around 9:40 am to avoid carrying high-value packages for extended periods given the spate of robberies recently.

f.  Also on July 18, 2025, at approximately 11:00 am, a black SUV consistent with VEHICLE 2 arrived.  It later departed just before 12:00 pm, but the license plate was not visible from the surveillance position.

57.    Additional surveillance of the SUBJECT PREMISES 2 was conducted on July 23, 2025, and revealed the following:

a.  Upon arrival, an investigator observed VEHICLE 3 parked outside the unit. An Asian female and Asian male were observed inside SUBJECT PREMISES 2 as the garage bay door was open. At 9:40 am, UPS arrived and kept delivering packages until 10:25 am. At 10:00 am, VEHICLE 2 arrived. At 11:25 am, VEHICLE 4 pulled in and parked. VEHICLE 4 later left at 12:15 pm.

b.  At 12:30 pm, FedEx ground arrived and offloaded packages for approximately 10 minutes. Shortly after, the investigator spoke to the FedEx driver at his next stop away from SUBJECT PREMISES 2. The driver stated he had just delivered 58 packages and had delivered 500 packages to SUBJECT PREMISES 2 on Monday. The driver estimated the average is about 150 per day and noted that he just started delivering to SUBJECT PREMISES 2 last week. The person who signed for the packages signed as "Wei."

c.  At approximately 12:50 pm, the investigator observed the plates on VEHICLE 3 as New Hampshire "USA8888" and VEHICLE 2 as New York "LEE333." Again, these are the same vehicles observed working at SUBJECT PREMISES 1.

58.     On August 6, 2025, the FedEx located at 10 Industrial Drive in Londonderry, NH, advised me that a new warehouse located at 183 Londonderry Turnpike, Unit 4, in Hooksett, NH (SUBJECT PREMISES 3) had just started receiving Apple shipments. FedEx further advised that Shanbin LIN of SUBJECT PREMISES 1 and 2, who FedEx sees almost daily, informed FedEx of this new address. FedEx had several packages (all from Apple) on August 5 and 6 to SUBJECT PREMISES 3. Shanbin LIN signed for these packages.

59.     As described above and below, surveillance conducted by investigators of SUBJECT PREMISES 1, 2, and 3 has confirmed that all three locations are being operated by the same cell of Asian persons.

### Apple Products Sent to SUBJECT PREMISES 3

60.     As with SUBJECT PREMISES 1 and 2, records were obtained from Apple for order information on the Apple shipments to 183 Londonderry Turnpike, Unit 4, Hooksett, NH (SUBJECT PREMISES 3). Since SUBJECT PREMISES 3 just became operational in early August, orders have been minimal compared to the other warehouses. Records indicate that SUBJECT PREMISES 3 has received 15 Apple devices, with orders beginning on July 24, 2025 and ending August 5, 2025, when records were obtained. These 15 orders total $10,705.00.

61.     Based on the limited orders to date, Apple provided the entire order history associated with SUBJECT PREMISES 3.  A review of these orders indicates fraud within each purchase:

      a.  All 15 orders were funded entirely with gift cards. It appears each order was linked to a separate unique Apple ID account. However, the devices were purchased either by first uploading gift cards to an Apple ID wallet or by using the gift cards directly without pre-uploading them to the account wallet.

b.  Out of the 15 orders, five orders involved uploading gift cards to the Apple ID wallets first and then making the purchase using the Apple ID wallet balance. All five of these orders were placed on July 24, 2025 and utilized 36 gift cards in total. The denominations of these gift cards ranged from $100 to $500. All gift cards were purchased from various merchants, such as Walmart, CVS, and Dollar General. All the gift cards were also activated in the United States. However, 22 were redeemed in Hong Kong and the remaining 14 were redeemed in Vietnam.

c.  35 of the 36 gift cards used were activated on July 24, 2025 (the day of the Apple ID wallet orders), between the hours of 10:49 pm and 11:48 pm. The remaining card was activated on July 25, 2025, at 12:01 am. Again, all cards were activated in the U.S. but redeemed in Hong Kong and Vietnam.  I believe the apparent discrepancy arising from the one gift card that was activated on July 25 but used on July 24 is attributable to the 12-hour time difference between Hong Kong and U.S. Eastern Daylight Time or the 11-hour time difference between Vietnam and U.S. Eastern Daylight Time. It is believed that the actors involved in this scheme use the cards quickly before they are flagged or frozen by the vendor or merchant.

d.  The remaining 10 orders were funded directly with gift cards without first uploading them to an Apple ID account wallet. These orders utilized 78 gift cards in total. Most of these orders used multiple gift cards. Denominations ranged from $0 to $500. Numerous gift cards in these transactions showed a gift card balance of $0 that were used. According to Apple, it is believed these

$0 gift cards were an attempted use of that card despite the cards not having any funds on them. I believe that the fraudsters in this scheme may acquire the $0 cards without knowing they had no money on them or lose track of which ones have already been used, based on the sheer volume of cards being transacted. Apple did not provide activation and redemption data for these direct gift card purchases.

e. Purchases for all 15 orders were for Apple iPads and iPhones, ranging in price from $349 for an iPad WiFi (128GB) to $999 for an iPhone 16 Pro (128 GB).

f. Law enforcement reviewed the "Bill To" customer information for all 15 orders. There were four orders that included the same "Bill To" name of "selena Z." These four orders also used SUBJECT PREMISES 3 as the "Bill To" address. However, the emails and phone numbers used on these four orders were all different. The remaining 11 orders used all different names, addresses, phone, numbers, and emails in the "Bill To" section. The "Bill To" addresses were from 11 different states. One address in particular, 705 Church Street, Friend, KS 67871-1546, does not appear to exist, according to Google Maps and other online sources.

g. A review of the "Bill To" phone numbers listed for the 15 orders further indicates fraud. Despite all 15 orders having "Bill To" addresses in the U.S., many of the area codes are not U.S.-assigned area codes and do not match the geographical locations of the associated addresses. Using multiple online sources, including the NANPA website, six numbers use non-U.S. assigned area codes: 392, 328, 749, 825, 467, and 284. Of the remaining nine orders

30

with valid U.S. area codes, not one of them match the "Bill To" state. For instance, the phone number (307) 925-8146 was used for an order with a "Bill To" address of 608 Della St., Tappahannock, VA 22560. However, the area code 307 is assigned to Wyoming, not Virginia, according to NANPA. All of these 15 "Bill To" phone numbers are the same as the "Ship To" phone numbers.

h. In the "Ship To" section, all 15 orders were shipped to SUBJECT PREMISES 3. In reviewing these orders, the four aforementioned "Bill To" names of "selena Z" were also used as the "Ship To" names, except one order reversed the name and wrote it as "Z selena." A batch of six other "Ship To" names included "Elroy" as the first name, with all six of these having different last names. All six "Elroy" orders had completely different first and last names of the "Bill To" names they were associated with. The remaining five "Ship To" names were the same as the "Bill To" names.

i. The emails used for each order appear to remain the same in the "Bill To" and "Ship To" section, but with all 15 orders using different emails. This is odd considering four orders are in the same "Bill To" and "Ship To" name of "selena Z" or "Z selena." Similar to their differing phone numbers, their emails were also different. Most emails also appear to be bogus or use odd domains, such as r8e6v34l@zhouwei7.com or 2zzy1s5gealconvkqy2@gmail.com.

**Surveillance of SUBJECT PREMISES 3**

62. Surveillance of SUBJECT PREMISES 3 has confirmed that several of the same subjects and vehicles operating SUBJECT PREMISES 1 and 2 are also operating SUBJECT PREMISES 3. Since SUBJECT PREMISES 3 has only been operational since early August 2025, surveillance by investigators has been limited.

63. Surveillance has revealed the following:

    a. On August 6, 2025, an investigator observed VEHICLE 1 parked behind SUBJECT PREMISES 3. The rear portion of SUBJECT PREMISES 3 was observed to have a large bay door and a walk-through door to the left of it. VEHICLE 3 was parked at the edge of the parking lot, nearly straight out from SUBJECT PREMISES 3's rear doors.

    b. On August 7, 2025, an investigator observed VEHICLE 3 already parked at the rear of SUBJECT PREMISES 3. At approximately 9:30 am, VEHICLE 1 arrived and parked in the rear near VEHICLE 3. A younger Asian male exited the vehicle and walked to the front of SUBJECT PREMISES 3 and entered through the door labeled Unit 4 (SUBJECT PREMISES 3). At approximately 10:30 am, VEHICLE 3 departed.

64. Surveillance conducted on SUBJECT PREMISES 1, 2, and 3, as well as their old warehouse at 3 Owens Court in Hampstead, NH, (hereinafter the "FORMER PREMISES") has routinely observed many of the same aforementioned subjects working at each location. In addition to those identified from the WPD traffic stop of VEHICLE 4, Tommy LI and Chengbin LI have also been positively identified. VEHICLES 1 through 4 have been identified at each location, except for VEHICLES 2 and 4, who were not yet observed at SUBJECT PREMISES 3 given that warehouse only recently opened.

32

65.     Tommy LI was first identified in early 2024 while surveilling the FORMER PREMISES.  On multiple occasions, investigators observed LI receiving Apple packages from FedEx and UPS and later driving away with them after they were re-packaged.

66.     On February 20, 2024, LI was observed taking packages into his former Manchester, NH residence at 88 Sundial Avenue from VEHICLE 4. These packages were observed going into VEHICLE 4 earlier that same day at the FORMER PREMISES.  Also on February 20, 2024, investigators observed an Asian female carrying two bags out of the FORMER PREMISES and disposing of them in a nearby dumpster. Investigators retrieved one of those bags and later found numerous carboard shipping boxes sent from Apple to the FORMER PREMISES, many in the name of "Lin Tommy" and "Tommy LIY."

67.     Additionally, during an interview of a suspect involved in an HSI Providence, RI case for similar Apple-related gift card fraud, the subject advised law enforcement that they were directed to bring bulk cash obtained from the fraud to a "Tommy LI" and another individual. The subject explained that Tommy LI and his partner would then send the currency to China via the Alipay application. Tommy LI was used because he charged a lower transaction fee. The suspect then spoke about involvement with other co-conspirators who would send Apple IDs that contained funds to make fraudulent purchases of Apple products. Those devices were then delivered to an unknown storage facility in New Hampshire.

68.     Chengbin LI and VEHICLE 2, which is registered in his name, were also observed at the FORMER PREMISES, as well as SUBJECT PREMISES 1 and 2. Between early 2024 and August 205, he has been observed receiving packages from Apple and later driving away with them after they were re-packaged.

33

69.     On February 14, 2024, Chengbin LI was followed by investigators from his then-residence at 88 Sundial Avenue in Manchester, NH to 59 Forest Road, Unit C, Wilton, NH. Subsequent surveillance of this unit and information obtained from FedEx, UPS, and Apple revealed that this unit was receiving bulk Apple electronics on a near-daily basis. Information obtained from the lease agreement for this unit revealed that Chengbin LI was the lessee of the unit. A subsequent search warrant for this unit was obtained in November 2024. *See* Case No. 24-mj-307-01-AJ.  Over 600 brand new iPhones were seized that had just been delivered, totaling over $600,000.00 in value. Leading up to this search warrant, records obtained from Apple revealed that the Wilton unit had received 4,158 Apple devices from January 2024 to May 2024, reflecting a $4,921,175 transaction value. These purchases were made using 2,991 Apple ID accounts, 2,989 different email addresses, and 1,295 different phone numbers. The purchases were made using 139,768 gift cards, which had over $4.5 million in value loaded. Of these gift cards, 118,713 were loaded from China.

70.     Shanbin LIN and VEHICLE 1 have also been observed several times coming and going from SUBJECT PREMISES 1, 2, and 3. In the aforementioned trash pull at the FORMER PREMISES, numerous Apple shipping boxes were also found to be sent to Shanbin LIN, all using different variations of his name, to include "lin P shanbin," "shabin linA," and "SHANBIN LIN 56." Displayed on the front door of SUBJECT PREMISES 1 is "One Platinum LLC." According to public records from the New Hampshire Secretary of State, Shanbin LIN is the registered agent for this company. The registered office address is 8 Derry Way, Apt. 18, Derry, NH 03038 and the mailing address is listed as 112 Bowery, FL1, New York, NY 10013.

**TECHNICAL TERMS**

71.　　Based on my training and experience, I use the following technical terms to convey the following meanings:

i.　　Internet Protocol Address: An Internet Protocol address ("IP address") is a unique numeric address used by devices on the Internet. Every device attached to the Internet must be assigned a public IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. An IP address acts much like a home or business street address—it enables devices connected to the Internet to properly route traffic to each other. Devices connected to the Internet are assigned public IP addresses by Internet service providers ("ISPs"). There are two types of IP addresses: IPv4 (Internet Protocol version 4) and IPv6 (Internet Protocol version 6). An IPv4 address has four sets ("octets") of numbers, each ranging from 0 to 255, separated by periods (e.g., 149.101.82.209). An IPv6 address has eight groups ("segments") of hexadecimal numbers, each ranging from 0 to FFFF, separated by colons (e.g., 2607:f330:5fa1:1020:0000:0000:0000:00d1).

ii.　　Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

iii.     Storage medium: A storage medium is any physical object upon which computer

data can be recorded.  Examples include hard disks, RAM, floppy disks, flash

memory, CD-ROMs, and other magnetic or optical media.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

72.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the SUBJECT PREMISES 1, 2, and 3, VEHICLES 1,

2, 3, and 4, and the persons of Tommy LI, Chengbin Li, and Shengbin LIN, (collectively the

"SEARCH LOCATIONS") in whatever form they are found.  One form in which the records

might be found is data stored on a computer's hard drive or other storage media.  Thus, the

warrant applied for would authorize the seizure of electronic storage media or, potentially, the

copying of electronically stored information, all under Rule 41(e)(2)(B).

73.     Probable cause.  I submit that if a computer or storage medium is found on or in

the SEARCH LOCATIONS, there is probable cause to believe those records will be stored on

that computer or storage medium, for at least the following reasons:

i.      Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when

files have been deleted, they can be recovered months or years later using forensic tools.

This is so because when a person "deletes" a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the storage medium until it is

overwritten by new data.

ii.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

iii.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

iv.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

v.     Based on actual inspection of other evidence related to this investigation, including spreadsheets, financial records, invoices, labels, and others, I am aware that computer equipment was used to generate, store, and print documents used in the TARGET OFFENSES.  There is reason to believe that there is a computer system currently located on or in the SEARCH LOCATIONS.

74.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes

how computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the

SEARCH LOCATIONS, because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or

38

storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant

insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40

75.     Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

i.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

ii.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge

41

will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

iii.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

76.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**UNLOCKING DEVICES**

77.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners and facial recognition

features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  Based on my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged

43

in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric

44

features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the SUBJECT PREMISES 1, 2, and 3, and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at SUBJECT PREMISES 1, 2, and 3, and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**CONCLUSION**

78.    Based on the foregoing, I believe that SUBJECT PREMISES 1, 2, and 3, which are described more fully in Attachments A-1, A-2, and A-3; the persons of Tommy LI, Chengbin LI, and Shanbin LIN, which are described more fully in Attachments A-4, A-5, and A-6; and VEHICLES 1 through 4, which are described more fully in Attachments A-7 through A-10,

45

contain items described in Attachment B that constitute evidence, fruits, or instrumentalities of the TARGET OFFENSES.  Accordingly, I respectfully request that this Court issue a search warrant authorizing the search of SUBJECT PREMISES 1, 2, and 3; the persons of Tommy LI, Chengbin LI, and Shanbin LIN; and VEHICLES 1, 2, 3, and 4, for the items described in Attachment B.

Respectfully submitted,

/s/Bradley Nims
Special Agent Bradley Nims
Homeland Security Investigations


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Talesha L. Saint-Marc
U.S. Magistrate Judge
District of New Hampshire

**ATTACHMENT A-1**
(Description of Property to be Searched)


The commercial property located at 10 Harris Road, Unit G, Windham, NH (SUBJECT

PREMISES 1), is a single garage bay warehouse unit approximately 1,400 square feet. The unit

is a single-garage bay warehouse unit. The unit appears to be one story that includes a loft inside.

It is attached to eight other separate garage bays, which are not interconnected, and all are part of

a larger commercial building. The unit has off-white metal siding and a green metal roof. It has a

large white garage door with three rectangular windows. To the right of the garage door is a

rectangular window with a main entrance door to the right of that marked "Unit G." A red arrow

points to the garage bay door, and a yellow arrow points to the entrance door.



**ATTACHMENT A-2**
(Description of Property to be Searched)


The commercial property located at 19 Hazel Drive, Suite 1, Hampstead, NH (SUBJECT PREMISES 2), is a single-garage bay warehouse unit. The unit appears to be one story with a possible loft inside. It is attached to three other separate garage bays, which are not interconnected, and all are part of a larger commercial building that has a residential appearance. The unit has white vinyl siding and a large off-white garage door with four rectangular windows. To the left of the garage door is a beige/gray entrance door marked "STE 1." To the left of this door is a black mailbox labeled "Unit 1," with a yellow concrete pylon positioned between the entrance door and the garage door. An additional yellow pylon is located to the right of the garage door. The unit is the end unit, located closest to the wood line. A red arrow points to the garage bay door, and a yellow arrow points to the entrance door.



**ATTACHMENT A-3**
(Description of Property to be Searched)


The commercial property located at 183 Londonderry Turnpike, Unit 4, Hooksett, NH (SUBJECT PREMISES 3), is a single-garage bay warehouse unit with a front-facing first-floor office space.  Facing the roadside, the front of the unit appears two stories, though only the ground level is used and is not connected to the second floor. The front door is a gray door with a large window panel, displaying a "Unit 4" sticker. The entrance is beneath a white overhang deck attached to the second story.

To the right of the front door are three ground-level windows, each directly beneath identical second-story windows, all with gray shutters on the ends. On the woodside facing rear corner of the unit is a gray door labeled "All Works Construction Inc," with a square second-story window directly above it. To the right of this door is a large white garage bay door with three rectangular windows, positioned between two yellow bollards.

The warehouse area connects to the front office by an interior door. The unit does not connect internally to the unit to its north. It is attached to three other separate garage bays, which are not interconnected, and all are part of a larger commercial building with a two-story, residential-style appearance. The roadside-facing side of the building features off-white brick siding, while the rear has off-white brick on the upper portion and beige brick siding on the lower portion. A red arrow points to the garage bay door, and yellow arrows point to the entry doors.

49






**ATTACHMENT A-4**
(Description of Person to be Searched)

Tommy LI is an Asian male born ███████ 1985, who is listed as 5'08", weighing approximately 140 pounds, and having black hair, and brown eyes, according to law enforcement databases.



**ATTACHMENT A-5**
(Description of Person to be Searched)

Chengbin LI is an Asian male born ███████████ 1983, who is listed as 5'07", weighing

an unknown amount, and having black hair, and brown eyes, according to law enforcement

databases.



**ATTACHMENT A-6**
(Description of Person to be Searched)

Shanbin LIN is an Asian male born ██████████ 1994, who is listed as 5'07", weighing

approximately 133 lbs, and having black hair, and brown eyes, according to law enforcement

databases.



**ATTACHMENT A-7**
(Description of Property to be Searched)

VEHICLE 1 is a white 2025 Porsche Panamera bearing Texas registration number VZK3451 and vehicle identification number ("VIN") WP0AE2YA4SL045877. This vehicle is registered to Kaiqiang ZHANG and Shanbin LIN at an address of 1850 Mercer Parkway, Apt 14310, Farmers Branch, TX 75234. VEHICLE 1 is depicted in the images below, with a red arrow pointing to VEHCILE 1.



**ATTACHMENT A-8**
(Description of Property to be Searched)

VEHICLE 2 is a black 2023 Cadillac Escalade bearing New York registration number LEE333 and vehicle identification number ("VIN") 1GYS4GKL2PR435163. This vehicle is registered to Chengbin LI at an address of 903 59th Street, Floor 3, Brooklyn, NY 11219. VEHICLE 2 is depicted in the images below, with a red arrow pointing to VEHCILE 2.



**ATTACHMENT A-9**
(Description of Property to be Searched)

VEHICLE 3 is a black 2022 BMW X7 bearing New Hampshire registration number USA8888 and vehicle identification number ("VIN") 5UXCW2C07N9K03262. This vehicle is registered to Tommy LI at an address of 79 Caldwell Road, Nashua, NH 03060. VEHICLE 3 is depicted in the images below, with a red arrow pointing to VEHICLE 3.



**ATTACHMENT A-10**
(Description of Property to be Searched)

VEHICLE 4 is a white 2023 Kia Carnival bearing New Hampshire registration number 550 0533 and vehicle identification number ("VIN") KNDNB4H35P6196711. This vehicle is registered to Tommy LI at an address of 79 Caldwell Road, Nashua, NH 03060. VEHICLE 4 is depicted in the images below, with a red arrow pointing to the VEHCILE 4.





**ATTACHMENT B**
(Description of Items to be Seized)

The items to be searched for and seized are the following:

1.      All records relating to violations of 18 U.S.C. §§ 1341, 1343, 1349, 1956, 1957 (mail fraud, wire fraud, money laundering, and related conspiracies), those violations involving **Tommy Li, Chengbin Li, Shanbin Lin, Yongzhen Li, Fengpeng Weng, and other co-conspirators,** and occurring after **January 1, 2025**, including but not limited to (1) books; (2) records; (3) correspondence; (4) ledgers; (5) logs; (6) journals; (7) shipping labels; (8) invoices; (9) accounts payable and receivable; (10) financial statements; (11) contracts or agreements between buyers and sellers; (12) receipts; (13) phone records; and (14) address records;

2.      All records pertaining to the acquisition, use, or transmission of gift cards;

3.      All records pertaining to the use or transmission of cryptocurrency;

4.      All records pertaining to the use or transmission of fiat currency, including through wire or check;

5.      All packages in retail boxes or containers;

6.      All packages in shipping boxes or containers;

7.      All devices capable of communications via WeChat, including but not limited to personal cell phones;

8.      Electronics contained in their original packaging, to include cell phones (such as iPhones), laptops (such as Mac laptops), AirPods, Apple Watches, tablets, printers, scanners, smart watches, gaming consoles, GPS devices, and headphones;

9.      Indicia of occupancy, residency, and/or ownership of the SUBJECT PREMISES, including but not limited to (1) identification documents, (2) driver licenses, (3) passports, (4)

58

utility and telephone bills, (5) deeds, (6) leases, (7) rental agreements, (8) photographs, and (9) keys which tend to show the identities of the occupants, residents, and/or owners. This search warrant shall include a search of any and all persons encountered at the SUBJECTS PREMISES, which will be limited in scope for the purpose of retrieving the aforementioned identification items;

10.    Financial records including bank statements, bank receipts, passbooks, bank checks, money market or similar accounts, money drafts, letters of credit, payroll documents, employment information, income and expense records, Federal and State income tax returns, money orders, cashier checks, loan applications, credit card records, safety deposit boxes;

11.    U.S. currency, cryptocurrency, or any and all monetary instruments, or other items of value used in, or intended for use in, or derived from mail fraud, wire fraud, money laundering, and related conspiracies;

12.    Virtual currency and related records of any kind, to include: any and all representations of virtual currency public keys or addresses, whether in electronic or physical format; any and all representations of virtual currency private keys, whether in electronic or physical format; any and all representations of virtual currency wallets or their constitutive parts, whether in electronic or physical format, to include "root keys" which may be used to regenerate wallet;

13.    PGP keys and/or encryption passwords or keys of any kind; and

14.    Packing material, postal records or inserts relating to any shipping.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.      evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      evidence of the times the COMPUTER was used;

i.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

60

k.       records of or information about Internet Protocol addresses used by the COMPUTER;

l.       records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.       contextual information necessary to understand the evidence described in this attachment.

n.       Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.